RECEIVED
U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

2014 APR 14  AM 9:32

JAMES W. McCORMACK, CLERK
BY:_____
              DEP. CLERK

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
APR 14 2014
JAMES W. McCORMACK, CLERK
By:_____
              DEP CLERK

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF ARKANSAS
# LITTLE ROCK DIVISION

**DAVID STEBBINS**                                    **PLAINTIFF**

**VS**                    CASE NO. 14-  227-KGB

**STATE OF ARKANSAS**                          **DEFENDANTS**
**MIKE BEEBE, in his official capacity**
**as Governor of Arkansas**

This case assigned to District Judge _____
and to Magistrate Judge _____

## COMPLAINT AND JURY DEMAND

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following complaint

against the State of Arkansas for retaliation in violation of two statutes: Section 503 of the

Americans with Disabilities Act of 1990, and also the Rehabilitation Act of 1973. Plaintiff also

seeks injunctive relief against the Governor to prospectively rectify the customs of the State

which gave this retaliatory conspiracy a foundation.

## JURISDICTION AND VENUE

1.      This court has jurisdiction over this dispute 42 USC § 12203 and also 29 USC § 794.

Also, the Court has jurisdiction to enjoin state officials from unconstitutional acts and omissions

under the precedent of *Ex parte Young*, 209 U.S. 123 (1908).

2.      Since the State of Arkansas is headquartered in Little Rock, venue is proper in this Court

under 28 USC § 1391(b)(1).

## SOVEREIGN IMMUNITY

3.      Since Plaintiff knows that the Court has this on its mind, let's get it out of the way right

off the bat.

4.      The State of Arkansas is not immune from suit for violations of the Americans with

Disabilities Act, especially when those violations result in the injury of loss of access to the

courts.  See *Tennessee v. Lane*, 541 U.S. 509 (2004).

5.     In addition, because this complaint is based around total fabrication of causes of action

for the specific purpose of persecuting Plaintiff for an act which is otherwise protected by the

First Amendment, even *prosecutorial* immunity does not protect the Defendant.  See *McGhee v.*

*Pottawattamie County, Iowa*, 547 F. 3d 922 (8th Cir. 2008).

6.     The qualified immunity analysis will be addressed later in this complaint, since Plaintiff

believes it best to establish the facts of the case and establish the atmosphere surrounding this

issue before he tackles it.  The issue of qualified immunity will be tacked in Paragraphs #25-32

of this Complaint.

7.     Of course, all this talk about immunity in one form or another is just beating a dead hose.

As will be discussed in detail in Paragraphs #34 – 39 of this Complaint, sovereign immunity in

all its forms has not bee abrogated, but freely and voluntarily waived, by the State in this case.

## BACKGROUND

8.     Plaintiff has filed numerous lawsuits in the past.

9.     However, Plaintiff asserts the following (and yes, there is a *reason* this paragraph is being

divided up in this way; said reason will be made clear later on):

(a)     Almost all of these lawsuits were either for discrimination in violation of the

Americans with Disabilities Act (specifically, failure to provide reasonable accommodations

for Plaintiff's Asperger Syndrome), or for Retaliation in violation of Section 503 of the

Americans with Disabilities Act, which places them squarely within the protection of Section

503 of the Americans with Disabilities Act.

(b)     Although the *number* of lawsuits Plaintiff has filed were large, none of them were

frivolous.

10.    Because of their lack of frivolousness, the State of Arkansas had no chance whatsoever of convicting Plaintiff of the crime of malicious prosecution[1], but since the lawsuits Plaintiff had filed were unpopular with the government, they decided to persecute Plaintiff without giving him a fair trial (since it was a choice between that and simply respecting Plaintiff's legal right to court access, they apparently decided that the latter option was 100% out of the question).

11.    Thus, on November 24, 2011, Plaintiff was arrested for domestic battery after his father – who was in cahoots with the State – framed him for the crime.  This was not done because the State believed him guilty of domestic battery, but rather, to give Plaintiff a taste of incarceration, and break his spirit, so that the State could use the threat of *additional* incarceration in order to coerce Plaintiff into dismissing his lawsuits. There was nothing even facially legitimate about their coercion; it was simply "stop filing lawsuits we disagree with, or go to prison. Pick your poison." Plaintiff offered some potentially exculpatory evidence to the police officer performing the arrest in the hopes of eliminating probable cause under the precedent of *Keuhl v. Burtis*, 173 F.3d 646, 650-651 (1999), but this offer for exculpatory evidence was entirely ignored because they did not want to lose the chance they aleady had to persecute Lawsuit Man.

12.    In the month of April 2014, Plaintiff's charges were dismissed, satisfying the precedent of *Heck v. Humphrey* as discussed in Paragraph 18(a) of this Complaint, and – under the continuing violations doctrine – allowing the six month statute of limitations for discrimination claims to begin at that period.  Plaintiff was *going* to provide a copy of the order dismissing the charges, but Plaintiff cannot obtain such a copy since the record was sealed against public inspection. Therefore, Plaintiff will simply have to demand a copy of that order in the discovery in this case. In the meantime, however, simply pleading this fact should be sufficient.  Anyway, once the

---

1   Class A Misdemeanor, Ark. Code Ann. § 5-53-131

issue of lawsuits was no longer part of the case, the State quickly agreed to dismiss the criminal proceedings, since the proceedings were not about any domestic battery dispute and they never were.

13.     Now that the charges have been dismissed, Plaintiff requests that the State (who, to repeat, is *not* immune from suit; see Paragraphs #4-7 of this Complaint) compensate him for each and every dime he lost, both as a direct and indirect result of his pre-trial incarceration, money paid in bail, psychological trauma suffered during incarceration, and commercial benefits lost both directly and indirectly due to being made the Defendant in that criminal case.

14.     The Arkansas Department of Justice receives federal financial assistance for at least two of its programs.  See the email sent to Plaintiff which is heretofor attached as Exhibit A.

## ARGUMENT AND LAW

15.     For the following reasons, the Plaintiff has the right to receive a trial for damages on this matter:

### Essential Elements of ADA retaliation.

16.     This case is governed by the precedent of *Amir v. St. Louis University*, 184 F. 3d 1017, 1025 (8th Cir. 1999), which states that, in order to prevail on a claim for ADA retaliation, a Plaintiff must show …

   (a)     … that he engaged in a statutorily protected activity,

   (b)     … that an adverse action was taken against him, and

   (c)     … a causal connection between the adverse action and the protected activity.

17.     "A person cannot show that he engaged in a statutorily protected activity without first demonstrating that he had a good faith reasonable belief that the alleged retaliator was engaging in discriminatory activity."  See *id.*

18.     In addition, the following precedents (which are not applicable to all ADA cases) are applicable to this case:

(a)     Whenever a Plaintiff is filing a suit that challenges the validity of any criminal proceeding, he must also have already prevailed in the proceeding whose legitimacy he challenges.  See *Heck v. Humphrey*, 512 US 477 (1994).

(b)     To recover compensatory damages, the discrimination or retaliation must be intentional.  See *Meagley v. City of Little Rock*, 639 F. 3d 384, 389 (8th Cir. 2011).

(c)     In order to be bound by the provisions of the Rehabilitation Act (instead of *just* the Americans with Disabilities Act), the Defendants must receive federal financial assistance in some capacity.  See 29 USC § 794(a).

19.     At the complaint stage, however, Plaintiff is merely required to *plead* these elements; actual evidence comes later.

20.     Plaintiff has plead sufficient facts in this Complaint, as follows:

(a)     Paragraph #9(a) of this Complaint alleges the first element.

(b)     Paragraph #9(b) sufficiently pleads the element spoken of in Paragraph #16 of this Complaint, which is why Paragraph #9 was broken up like it was.

(c)     Paragraphs #10 – 11 plead the elements listed in Paragraphs #15(b) and #15(c) of this Complaint.

(d)     Paragraph #12 of this Complaint sufficiently pleads the element described in Paragraph #18(a).

(e)     The element described in Paragraph #18(b) does not need to be specifically plead, since it goes without saying that the actions described in Paragraph #11 were necessarily intentional.

21.     The Court could also find persuasive precedent in the tort of First Amendment

Retaliation.  Although the State is immune from suit for those claims, it can nevertheless offer

guidance regarding Plaintiff's substantive legal rights unless the precedent specifically conflicts

with the equivalent precedent under the ADA.  To that extent, Plaintiff cites the precedent of

> "The question is not whether the plaintiff [him]self was deterred, though how
> plaintiff acted might be evidence of what a reasonable person would have done.
> What would a person of 'ordinary firmness' have done in reaction to the [criminal
> court proceedings]? Would he or she have simply ignored them, or would he or
> she have been slowed down, at least to some degree?"

22.     This is an important distinction to make, because it eliminates, at the outset, the argument

the State of Arkansas no doubt plans to use ... the argument that, because Plaintiff – by evidence

of this very complaint right here – clearly must have survived the persecution with his court

access rights mostly intact, the persecution is rendered moot (an argument which was used, to no

avail, in the 9th Circuit in the case of *Rhodes v. Robinson*, 408 F. 3d 559 (9th Cir. 2005)).

23.     Last but not least, Paragraph #14 pleads (and even shows evidence for) the element

described in Paragraph #18(c) of this Complaint.

24.     Thus, Plaintiff has pled sufficient facts.

**Qualified Immunity**

25.     We now finally address the issue of qualified immunity which was foreshadowed in

Paragraph #6 of this Complaint.

26.     A Defendant who is a government or officer of a government is entitled to qualified

immunity insofar as his actions do not violate clearly established law.  *Roberts v. City of Omaha*,

723 F. 3d 966, 971-972 (8th Cir. 2013).  "If it [the law] was not clearly established, regardless of

whether [Plaintiff] has articulated a constitutional violation, the [government] employees are

entitled to qualified immunity." See *Hess v. Ables*, 714 F. 3d 1048, 1051 (8th Cir. 2013).  "A

constitutional or statutory right is clearly established if the contours of the right are sufficiently

clear that a reasonable official would understand that what he is doing violates that right." See

*Roberts* at 972.

27.     The actions pled in Paragraphs #7 – 11 of this Complaint are sufficient to allege a

violation of clearly established law.

28.     Although Plaintiff will only cite one case law for each element, these elements are

nevertheless "clearly established" because the precedents being cited are, themselves, citing long

chains of case law.  Even the least of these precedents cite at least three additional cases which

support their claims.

29.     "To punish a person because he has done what the law plainly allows him to do is a due

process violation of the most basic sort." See *United States v. Goodwin*, 457 US 368, 372 (1987).

30.     "For an agent of the State to pursue a course of action whose objective is to penalize a

person's reliance on his legal rights is patently unconstitutional." See *id* at 392.

31.     To deny a person any government benefit – even a discretionary one (such as a plea

agreement in a criminal case) – upon the exercise of any constitutional right is just as actionable

as if the exercise of the right were persecuted directly.  See *Koontz v. St. Johns River Water

Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013), and the mind-boggling amount of other cases cited

therein.  Indeed, even the Supreme Court itself referred to this doctrine as a "well-settled" one.

See *id* at 2594.  A narrow exception is made for when a prosecutor threatens to add additional

charges against a Defendant if that defendant does not agree to plead guilty to existing charges

(see *Bordenkircher v. Hayes*, 434 US 357, 363 (1978)), but NOT when the whole purpose for

bringing even the initial criminal proceedings in the first place was to give the government

artificial leverage to coerce the Defendant into waiving unrelated rights.  This is an important,

pivotal issue in this case, since the prosecuting attorney has already argued once before that, because he is not "required" to offer any plea bargains, he should be allowed to make whatever demands he wants in them without it being illegal; clearly established law plainly states the complete opposite.

32.    It is a constitutional right to file nonfrivolous lawsuits.  See *Woodford v. Ngo*, 548 US 81, 122 (2006) ("The right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances").

33.    Thus, the State had a clear and unmistakable obligation to back off of Plaintiff's nonfrivolous litigation practices, or at the very least, to provide him with full due process (including, but not limited to, appointment of counsel, full discovery, and – most importantly of all – a trial by a jury of his peers) if they believed the lawsuits to be frivolous.  They are clearly not protected by qualified immunity.

34.    All that talk about qualified/prosecutorial/State immunity is all fine and good, but it ultimately does not matter, because for the reasons coming up, the State of Arkansas never had immunity in this case to begin with; they have freely and voluntarily *wavied* this immunity.

### If the Rehabilitation Act is applicable, sovereign immunity is already lost.

35.    The State of Arkansas Department of Justice receives federal financial assistance on at least two of its programs.  See Paragraphs #14, #18(c), and #23 of this Complaint.

36.    Sovereign immunity in regards to the Rehabilitation Act – regardless of form – has been expressly stricken for any governmental entity who elects to receive federal financial assistance. See 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act ... or the provisions of any other Federal statute prohibiting discrimination by

recipients of Federal financial assistance.")

37.     This is not a requirement on any government's part. No one is forcing them to receive federal financial assistance for any purpose. Therefore, if the State wants its sovereign immunity back, all they have to do is stop taking the federal funds; it is as simple as that.

38.     Because this is clearly a valid give-and-take scenario between the State and federal governments, it has been upheld as a valid and uncoerced waiver of sovereign immunity. See Doe v. Nebraska, 345 F. 3d 593 (8th Cir. 2003).

39.     Therefore, the State of Arkansas is not immune from suit here. There is no Eleventh Amendment immunity. There is no prosecutorial immunity. There is no qualified immunity (even if the Defendants could show some reasonable ambiguity in the law). The State of Arkansas, here, is subject to the exact same liability for retaliating against Plaintiff's disability discrimination suits as if some random, private entity had filed suit against Plaintiff with the same goals ("same goals," means filing suit – possibly even using fake causes of action conjured out of thin air – with the hopes of coercing an agreement to not sue for discrimination).

### This Court should grant *in forma pauperis* in this case.

40.     Plaintiff is requesting leave to proceed *in forma pauperis* in this action, meaning that this Complaint is subject to *sua sponte* dismissal under 28 USC § 1915(e)(2). However, none of the grounds for dismissal given in that statute apply here.

41.     The case is not subject to dismissal pursuant to § 1915(e)(2)(A) because Plaintiff is clearly indigent, as evidenced by Plaintiff's attached *in forma pauperis* application.

42.     The case is not subject to dismissal pursuant to § 1915(e)(2)(B)(i) because it is clearly not frivolous. "Frivolous" means that a case lacks even an *arguable* basis in law. See *Neitzke v. Williams*, 490 US 319 (1989). A complaint that states a claim upon which relief can be granted

cannot possibly be legally frivolous.

43.     While it is possible for a claim to be *factually* frivolous, the test for determining factual frivolousness is set forth in the case of *Denton v. Hernandez*, 504 US 25 (1992), which unequivocally states that "[a]n *in forma pauperis* complaint may not be dismissed ... simply because the court finds the plaintiff's allegations unlikely." See *id* at 33. Thus, while the judges of this Court would love to simply trust the word of its State brethren (this phenomenon will be addressed in greater detail in Paragraphs #71 – 81 of this Complaint), it simply is not allowed to do so. The factual allegations contained in this complaint are clearly not frivolous; rather, it is for reasons just like this that our Founding Fathers passed the First Amendment in the first place.

44.     Nor can this Court dismiss this case under § 1915(e)(2)(B)(ii), or failure to state a claim. When dismissing for failure to state a claim, the Court really does have to accept all of the factual contents as true and in a light most favorable to the Plaintiff. See *Coleman v. Watt*, 40 F. 3d 255, 258 (8th Cir. 1994) ("We must assume that all the facts alleged in the complaint are true ... The complaint must be liberally construed in the light most favorable to the plaintiff").

45.     Last but not least, this case cannot be dismissed under § 1915(e)(2)(B)(iii) because, as Plaintiff has already established in Paragraphs #4-6 and Paragraphs #22-30 of this Complaint, the State is not immune from suit for damages here.

46.     Therefore, Plaintiff's application for leave to proceed *in forma pauperis* should be granted.

## INJURIES, DAMAGES & INJUNCTIONS

47.     Plaintiff suffered a variety of injuries and damages as a direct and indirect result of the criminal proceedings, as well as the pretrial detention which stemmed directly from the criminal proceedings. These injuries, how Plaintiff obtained them, and the damages Plaintiff requests as a

result of these injuries, are set forth below:

### Injury #1:  $660,000 for pretrial incarceration.

48.    Plaintiff was incarcerated for a total of 165 days as a direct result of the baseless criminal charges.  Aside from the mental anguish and trauma suffered at the hands of the jail guards, there was also the simpl fact that Plaintiff was unlawfully deprived of his liberty and suffered at least twenty distinct injuries as a direct result thereof.

49.    By nature of this incarceration, Plaintiff suffered at least sixteen (16) specific losses of rights:  (1) his freedom of movement (this is, easily, the most obvious injury stemming directly from pretrial incarceration), (2) his freedom to dress however he wants[2], (3) his right to choose what he eats, (4) his right to choose *where* he eats, (5) his right to choose *when* he eats, (6) his right to chose who he associates with[3], (7) his right to free speech[4], (8) his right to free press[5], (9) his right to be free from involuntary searches without probable cause, (10) his right to be free from fear of unlawful assault[6], (11) his right to privacy, (12) the right to his choice of medical care[7], (13) the right to enjoyment of Plaintiff's lawfully acquired property[8], (14) & (15) the right to enjoy the fruits of his labor[9], and (16) the 13th Amendment right to be free from involuntary servitude except upon being duly convicted[10].

50.    The United States Court of Appeals for the Eighth Circuit has held, in the year 1981, that, for each unlawful injury *within* incarceration, $100 per day per injury is an appropriate amount

---

2   Plaintiff was assigned an inmate uniform to make him look the part of a criminal. He had no choice but to wear the clothes the jail chose for him.

3   Plaintiff was restricted to only interacted with other inmates in the Pod the jail chose to place him in.

4   Plaintiff was required to "respect" the jail guards simply because they did not like him.

5   Same as injury #7.

6   Not only did placing Plaintiff next to dangerous inmates all gathered in one spot cause this injury, but as we will see Paragraphs #54 – 61, placing Plaintiff next to the GUARDS caused this injury.

7   The jail had a monopoly on medical care; Plaintiff had to either accept their medical treatment or have no medical treatement at all.

8   During incarceration, inmates are only allowed to have the specific things the jail allows.

9   Not only were the items Plaintiff could purchase with his commissary funds themselves limited, but Plaintiff had a monetary cap on the amount of ocmmissary purchases he was allowed to make.  This is why this injury counts as both #14 and #15.

10  While incarcerated, Plaintiff was made to perform janitor services for the jail, despite him not being convicted of anything. Though it could be argued that this was Boone County's policy and not the State's, the State is still liable for the same reasons as they are liable for Plaintiff's PTSD, which will be discussed in Paragraphs #54 – 61.

of compensatory damages. See *Maxwell v. Mason*, 668 F.2d 361, 365-66 (8th Cir. 1981).

51.     That case was publishedi n the year 1981.  According to an inflation calculator on the

website of the United States Beaureau of Labor Statistics, $100 in 1981 had the buying power of

$252 in the year 2011, which is when the injury occurred.

52.     Because the *entire incarceration* was unlawful, all sixteen of the injuries mentioned in

Paragraph #49 (as well any additional losses of rights Plaintiff can come up with in the future,

pursuant to Fed. R. Civ. P. 54(c)) are recoverable in this case.  This means that Paintiff's

damages, stemming directly from the *de jure* nature of the incarceration itself, is …

$$\$250 \times 16 = \$4,000 \text{ per day.}$$

53.     Since Plaintiff suffered a total of 165 days of pre-trial incarceration, that means the total

damages for this section come to $660,000.

**Injury #2: $25,000,000 for PTSD suffered by jail guard harassment.**

54.     While incarcerated, Plaintiff was harassed, bullied, and had his life threatened on

numerous occasions by the jail guards.   There was one specific jail guard by the name of Jason

C. Jones who already hated Plaintiff because his small business was on the defendants Plaintiff

had previously sued, and in his hate-filled rage, he went out of his way to make Plaintiff go

batshit insane.  As of the time of this writing, Plaintiff is preparing for an evidenciary hearing set

for April 22 in Case No. 12-3022 in the U.S. District Court for the Western District of Arkansas,

where he is suing Boone County for, among other things, this precise injury.  The Court may

view the complaint in that case if it wants specific details as to exactly what Jason Jones did to

torture Plaintiff.

55.     He succeeded in his mission to traumatize Plaintiff, as Plaintiff will call his neighbor as a

witness to testify that, even to this day (years later), Plaintiff displays numerous symptoms of

Post-Traumatic Stress Disorder.

56.    No medical documentation is needed to prove this injury.  See *Peoples Bank & Trust Co. v. Globe Intern.*, 786 F. Supp. 791, 796 (1992):

> "It may be true … that [Plaintiff] does not show a great deal of obvious injury, but a reasonable juror might conclude, after hearing the evidence … that [Plaintiff's] experience could be likened to that of a person who had been dragged slowly through a pile of untreated sewage. After that person had showered and a few weeks have passed, there would be little remaining visible evidence of the ordeal which the person had endured and the resulting damages incurred, but few would doubt that substantial damage had been inflicted by the one doing the dragging."

57.    A similar argument was addressed by the Arkansas Supreme Court in *Growth Properties I v. Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984) in connection with an appeal from a verdict rendered in a tort of outrage case. The court in *Growth* stated as follows:

> "Appellants' first two points for reversal may be treated as one—that it was error to award either compensatory or punitive damages in the absence of proof of actual damage. They submit that none of the appellees testified to any loss or injury "except rather vague references to feeling bad about it, or being 'heartsick'." But the answer to the argument lies in the fact that the essence of the tort of outrage is the injury to the plaintiff's emotional well-being because of outrageous treatment by the defendant. If the conduct is sufficiently flagrant to give rise to the tort, then the injury the law seeks to redress is the anguish itself and it need not rest, parasitically, on more demonstrative loss or injury…. Hence, mental anguish itself is the actual damage, and proof of special damage in terms of out-of-pocket expenses of exact pecuniary measurement is not essential to a recovery of compensatory damages." Id. at 474, 669 S.W.2d 447

58.    The State is liable for this injury because they knew of this particular jail guards' personal vendetta against Plaintiff and deliberately threw Plaintiff to the wolves.

59.    See, this is called the "Eggshell Skull Rule," and it goes like this:  Suppose an assailant punches a victim in the face, expecting to only cause skin-deep bruises, but by sheer chance, the victim's skull happens to be as delicate as an eggshell (hence the name of the doctrine) and so the punch ends up inflicting brain damage.  The assailant never anticipated that *specific* injury (brain

damage), or damages to that extent (six figures), but the Eggshell Skull Rule states that this does not matter; the assailant anticipated injury of *some nature*, and is therefore liable for all injuries he caused, whether he expected those specific injuries or not.

60.    Here, the State may or may not have acted with the specific intention of offering Plaintiff up as a piece of meat to this psychotic jail guard (and yes, he is psychotic; one of Plaintiff's strategies in the upcoming evidence hearing is to produce witness testimony that this Jason Jones demonstrates each and every known symptom of Antisocial Personality Disorder), but again, this is a moot point. They threw Plaintiff in jail with the intent of wrongfully injuring Plaintiff; therefore, they are liable for ALL injuries caused, regardless of whether they anticipated them.

61.    Admittedly, this is the sort of thing only Boone County would normally be liable for. However, as a matter of law and public policy, said exclusivity of remedy is usually based on the assumption that the pretrial detention was otherwise lawful (or, at least, that the State has prose-cutorial immunity from it). Here, because the State is liable – and not immune – for Plaintiff's incarceration, they are also liable for all injuries that would not have happened, but for Plaintiff's incarceration. Since Jones would not have gotten a chance to harass or bully Plaintiff were it not for the State making up stuff to charge Plaintiff with, the State's decision to fabricate charges is just as much a proximate cause of this injury as Jones' decision to actually do it.

### Injury #3:  $2,000,000 for loss of reputation.

62.    Because Plaintiff was accused of a violent crime, he suffered a sever loss of reputation. People like Jason Jones already had an opinion of Plaintiff that could not go any lower, but a lot of people who thought highly of Plaintiff (including some of his former high school teachers) began to think of Plaintiff as a monster.

63.    For the rest of Plaintiff's life, this will directly impact Plaintiff's ability to participate in

society unless he keeps this part of his past a secret. This, alone, is worth a million dollars.

64.      However, Plaintiff suffered an additional injury:  He has lost the confidence of his own

mother, as even she began to think of Plaintiff as a common criminal.  Because Plaintiff, for

axiomatic reasons, values her opinion over that of any other one individual, that alone

singlehandedly constitutes the additional half of the two million dollars that Plaintiff is

requesting here.

### Injury #4:  $2,000 in lost SSI funds.

65.      As the court can see from Plaintiff's *In Forma Pauperis* Application, Plaintiff's current

livelihood is Supplemental Security Income, which he recieves as a result of his Asperger

Syndrome.  However, when he was arrested, Plaintiff's SSI was revoked for aproximately three

entire months, and Plaintiff lost two thousand dollars worth of SSI funds.

66.      The State is liable to Plaintiff for that loss. They are liable for the same reasons they are

liable for Plaintiff's PTSD: Because the possibility that they never set out to cause this specific

injury is legally irrelevant.

### Injury #5: $1,440 in bail bonds.

67.      Plaintiff's bail for the domestic battery was set at $10,000. Plaintiff was forced to pay one

tenth of that in non-refundable payments to a bonding agent and a flat $70 to the jail for the

service of posting the bond.

68.      While incarcerated there, Jason Jones also caused Plaintiff to be charged with a frivolous

accusation of disorderly conduct, which forced Plaintiff to have to pay an *additional* $370 (that's

three hundred dollars for the disorderly conduct bail itself, and $70 for another instance of the

aforementioned flat fee) to be released from the pretrial detention that Plaintiff should never have

been subjected to in the first place.

69.     Add these four fees up, and we get a total of $1,440.

**Injury #6:   $2,505,006,094,000 for loss of civil cases.**

70.     This is not only the largest assessment of damages, from a quantitative standpoint, but is also the most important damage, since this entire Complaint has established that the State set out to cause Plaintiff this specific injury.

71.     While incarcerated, Plaintiff was unable to sufficiently prosecute – and thus lost – numerous cases which had enormous amounts of damages in controversy.  Not only was this the State's goal all along, but even if it was not, the State is still liable for this injury for the same reasons it is liable for Plaintiff's PTSD as described in Paragraphs #54 – 61.

72.     The civil cases which Plaintiff's pretrial incarceration proximately caused Plaintiff to lose are set forth below:

(a)     Loss of appeal of the case of Stebbins v. Microsoft. While incarcerated, Plaintiff had to prosecute his appeal in that case without having access to the local rules or precedents of the 9th Circuit Court of Appeals.  His inability to do any meaningful legal research led to him losing the appeal on a technicality.

(b)     Inability to prosecute the appeal the case of Stebbins v. Wal-Mart: While incarcerated, Plaintiff had no access to the address for the United States Court of Appeals for the 8th Circuit, or the United States Supreme Court, nor did he have access to the records of the 8th Circuit, so even if he knew the address, he still had no way of producing all the requisite papers for a Supreme Court Petition for Writ of Certeroiri.

(c)     Inability to file any appeal at all in case of Stebbins v. Golden: Plaintiff had been evicted from his apartment.  This was done to set up to frame Plaintiff for his felony by removing him from the neighbors who would testify on his behalf if they knew he was

innocent. The landlords and their attorney, Catherine Golden, cheated in the unlawful

detainer case, and Plaintiff was trying to sue them for abuse of process. While incarcerated,

the case was frivolously thrown out for failure to state a claim, and since Plaintiff had no way

of knowing about this, he missed his opportunity to appeal the dismissal of that case.

**Injunction to cease and desist "custom vs. policy" distinction.**

73.    Prosecuting Attorney Wes Bradford – representing the interests of the State of Arkansas –

set out to coerce Plaintiff into dismissing all his lawsuits, knowing full well that his actions were

patently illegal. He may not have realized that the State would not be immune from suit, but he

*did* know full well that his actions were patently illegal, and that he could very well have been

subject to sever sanctions, including disbarment and even a term of imprisonment for himself.

74.    So, why did he proceed with this conspiracy plan? The answer is simple:

75.    He knew that, although he *could* be sanctioned for this conduct (and that, in the interests

of fairness, he *should* be), he *wouldn't* be because it is the custom of the State of Arkansas to

always trust the word of its fellow government officers, one hundred percent of the time, no

matter what the evidence, no matter what the law requires, and no matter how heinous the

accusations.

76.    Plaintiff should probably take a moment to explain what he means by "the custom of the

State of Arkansas."

    (a)    The Supreme Court ruled, in the case of *Monell v. Department of Soc. Svcs.*, 436 US

    658 (1978), that municipal liability is established by a "policy or custom" of the municipal

    government. The 8th Circuit, interpreting this precedent, divided "policy" and "custom" into

    two similar but distinct concepts: A "policy" is *de jure* and official, often written down, and is

    often at least *somewhat* objective. A "custom," on the other hand, as defined by the 8th

Circuit, is a *de facto* action by the government's officers; this can independent from – and even in direct conflict with – *de jure* policies.

(b)     Sometimes, policy and custom are one in the same.  For example, it is, currently, the official policy of the State of Arkansas to not issue marriage licenses to couples where both persons in the couple are the same gender.  Likewise, almost all state officers who issue marriage licenses abide by this policy.  Sure, there may be one or two astronomical events where some deputy clerk slipped in a gay marriage license to her buddies in the hopes that she wouldn't get caught until the Supreme Court rules that gay marriage is a constitutional right.  But, for the most part, in this State, the custom matches the policy.  However, when the two do not match, it is the custom, rather than the policy, which forms the basis of governmental liability.

(c)     For the purposes of this Complaint, this is what Plaintiff means when he says that it is the "custom" of the State of Arkansas.

77.     Anyway, when Plaintiff said it was the custom of the State to always trust the word of its fellow government officers, no matter what, Plaintiff was not kidding.  Literally, if a prosecuting attorney were to forge evidence to have an innocent person executed on death row, and evidence of this forgery did not surface until after the execution already happened, the prosecuting attorney could simply "deny any wrongdoing," giving absolutely no details or evidence whatsoever to support this one sentence denial, and he would get off scott free.

78.     Case in point:

(a)     When Plaintiff, having been fed up with the Public Defenders Office's inability to grow a spine and file a motion to dismiss Plaintiff's charges due to the clear evidence of prosecutorial vindictiveness, finally resigned to filing a *pro se* Motion for Reappointment of

Counsel, demanding an attorney who would actually *defend* Plaintiff, prosecuting attorney

Wes Bradford then – and *only then*, after literally months of being a rock on the matter –

finally agreed to modify some portion of his demands that Plaintiff dismiss his lawsuits.

This, in Plaintiff's opinion, provides evidence to confirm Plaintiff's theory as described in

Paragraph #73: That Bradford knew full well that his actions were patently illegal. He gave

some ground after he realized that his initial belief as to lack of consequences would

ultimately be false. If he truly believed that his demands were legitimate and lawful, he

would have stood firm (or at the very least, not revoked them until Plaintiff gave a full

briefing as to why the demands were illegal, which Plaintiff did not; so clearly, Bradford

already knew them to be illegal, no explanation necessary).

(b)      However, he only *modified* his demand in a very half-arsed manner. He modified the

demands so that they were *less* intrusive on Plaintiff's right to court access than the original

demands were, but still intrusive. As a result, Plaintiff decided to stand firm and sfight

Bradford on it.

(c)      At the oral hearing for Plaintiff's *pro se* Motion for Reappointment of Counsel, Brad-

ford (who, it is worth noting, repeatedly badgered Plaintiff) completely lied to the state judge

and stated that he had completely revoked the demand to dismiss lawsuits, altogether. He

argued that, because of this, all possible vindictiveness – including whatever injuries Plaintiff

already suffered as a result of the unlawful pretrial detention – were moot.

(d)      Even if we were to accept as true the completely frivolous argument that Plaintiff's

previous injuries were moot simply because Bradfod had revoked some collateral demand

that actually served as evidence of a violation rather than the violation itself, that still rests on

the prerequisite assumption that the demand had been revoked, which, as established in sub-

paragraph (b), had not happened.

(e)     Despite Plaintiff's pleas to the contrary, the state Court simply trusted the word of the

prosecuting attorney and dismissed Plaintiff's complaint as moot.  No trial, no further

hearing, no further discussion, no nothing.  The judge never once required any showing of

actual *proof* that the demands had been revoked rather than merely modified (e.g. a copy of

the new offer would have sufficed for this evidence, except the judge never asked to see it).

(f)     Why did the judge trust the prosecutor's word so blindly?  Because it is the custom of

the State of Arkansas to *always* trust the word of its fellow government officers, no matter

what.  Always. The judge probably did not even hear Plaintiff's pleas to the contrary, not

because Plaintiff was not speaking clearly, but because all the judge could hear coming out of

Plaintiff's mouth was "contradicting prosecutor's word. contradicting prosecutor's word.

contradicting prosecutor's word."

79.   The event spoken of in Paragraph #76 wasn't even a one-time occurrence, either.  Here is

another example:

(a)     On the date of December 15, 2011, Plaintiff appeared before the Boone County

Circuit Court, where his at-the-time counselor petitioned the Court for a reduction of bail,

which at the time was set at $75,000.  If the Court has been paying attention, it would know

that this petition was granted; specifically, it was reduced by a whopping $65,000.

(b)     What may acutally come as a shock, however, is not just the fact that it the bail was

reduced, but rather, the *reason given* for such a massive reduction:  See, Plaintiff had

previously argued a *pro se* case before the same judge who was presiding over the criminal

case.  In that *pro se* case, Plaintiff impressed that state judge with his intelligence and his

uncanny ability to make legal arguments far exceeding that of a typical *pro se* litigant.  At the

bail hearing on December 15, 2011, the state judge stated that, in his opinion, this should work favorably to the Plaintiff as far as his bail reduction was concerned.

(c)     Think about that for a minute: By the state judge's own admission – BY HIS OWN ADMISSION – he was awarding Plaintiff an 87% reduction in bail … for absolutely no other reason than, he *liked* the Plaintiff! ***BY HIS OWN ADMISSION***!!!

(d)     Obviously, Plaintiff did not protest at the time, because it was in his best interests to keep his mouth shut. However, in the instant case, this evidence should put the final nail in the coffin that it is, indeed, the State's custom to engage in blatant acts of nepotism.

(e)     It is not merely that the judge *engaged* in such a blatant act of preferential treatment. Rather, it is the fact that he so freely confessed, on public record, to its status as nepotism which provides the evidence that this is a widespread custom. Why did the state judge so freely admit to this? Because he thought nothing of it. All his adult life, he has been surrounded in this type of environment. It's all he has ever known. Did the state judge really care that he was engaging in a completely unethical act of nepotism? Here's a better question: Did he even *notice* that he was doing that?! Because the transcript Plaintiff has in his possession seems to suggest that he didn't.

80.     Plaintiff could go on like this for ages, but by now, the Court probably gets the point. The bottom line is, while there may be *policies* in place which, on their face, seek to enforce these types of laws (such as the Bar Association enforcing prosecuting who use their position to persecute disfavored citizens, or the Judicial Discipline & Disability Commission to punish judges who fail to recuse themselves when they have a bias in favor of the prosecutor, or a policy of firing and subsequently prosecuting police officers who arrest people despite knowing that there is no probable cause), the *de facto* CUSTOM of the State is to never apply those policies.

Ever. Under any circumstances.

81.     This custom forms the basis of an independent constitutional violation, since it has the effect (intentional or otherwise) of infringing on Plaintiff's absolute right to an impartial judiciary. The right to be tried by an impartial tribunal is one of the few rights in this nation (along with freedom of thought) that is truly absolute; even the right to free speech has a few exceptions here and there, but a citizen's right to be tried by an impartial judiciary cannot be taken from him under any circumstances, whatsoever.

82.     Aside from being an independent constitutional claim, it is relevant in this case because, from a *factual* point of view, it laid the foundation for Wes Bradford's plot to persecute Plaintiff for his lawsuits. He did it for one reason and one reason alone: He knew he would not be punished for it, even though by law he *should* be punished. When the Motion for Reappointment of Counsel showed him that his expectation of impunity would not necessarily happen, he only then made even the shabbiest of attempts to create the illusion of propriety.

83.     For this reason, for Plaintiff's final demand for relief as part of this Complaint, he asks that the Court issue an injunction to co-defendant Mike Beebe – and to any future occupant of the office of the Arkansas Gubernatorial – to permanently cease and desist its custom of never enforcing the law against its own kind. The custom thereof should be ordered by the Court match the written polices to the same extent as the aforementioned example regarding gay marriage.

### JURY DEMAND

84.     Should a trial be necessary to determine any issues of fact, Plaintiff asks that the case be tried by a jury of his peers.

### CONCLUSION

85.     Let us recap the points of this Complaint:

(a)     Plaintiff is litigious, but not frivolous.

(b)     Despite knowing that Plaintiff was not a frivolous lawsuit filer, they decided to persecute him for his lawsuits anyway.  Since they could not convict Plaintiff of frivolous-ness, they knew that they had one chance to coerce Plaintiff into ending his lawsuit practices.

(c)     Therefore, they proceeded to fabricate charges (which eliminates prosecutorial immunity) and give Plaintiff a taste of incarceration so they could threaten to lock Plaintiff up for several years unless Plaintiff agreed to not file any more lawsuits they disagreed with.

(d)     Plaintiff suffered six (6) distinct injuries which he seeks to recover damages over, damages which the state enjoys no immunity against.

(e)     Plaintiff also seeks an injunction against the Governor (both the present Governor, and whoever else may be the governor in the future) to cease and desist the State's custom of non-enforcement of the laws against its own kind, as it was that custom which proximately caused its legal representative to feel comfortable engaging in such a blatantly illegal act of persecution for which the State is NOT immune.

(f)     Again, the State is NOT IMMUNE FROM SUIT IN THIS CASE!  Did we forget to mention that?  Because that's pretty important.

86.     Remember, at the pleading stage, the Court must accept all factual allegations to be true, unless they rise to the wholly incredible, fanciful, fantastic, or delusional (which these allegations are not, as they are wholly consistent with historical evidence of government abuses which led to the creation of the Bill of Rights in the first place). The State is not immune from suit in this case, and none of the prerequisites for dismissal of complaint have been satisfied.

87.     Wherefore, premises considered, Plaintiff requests that the Court award all the requested damages, award costs incurred, and other relief that the Court finds appropriate.

88.     So requested on this, 10th day of April, 2014.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

Subject:   FOIA Request

From:      Erika Gee (erika.gee@arkansasag.gov)

To:        stebbinsd@yahoo.com;

Date:      Monday, April 7, 2014 10:34 AM

Mr. Stebbins:

The Office of the Attorney General is not the custodian of records for any other state agency, and cannot respond to your request for records pertaining to prisons, prosecuting attorneys, or any other state agencies who may have federal funding.  Please redirect your inquiry to those entities directly.

Two programs at this office currently receive some level of federal funding: the Medicaid Fraud Control Unit and the Crime Victims Reparations Program.  In order to ensure an appropriate response, can you be more specific regarding what records you are seeking from these programs?

*Exh. A*