**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

**DAVID STEBBINS**                                            **PLAINTIFF**

**VS**                          **CASE NO. <u>4:14-cv-227-KGB</u>**

**STATE OF ARKANSAS**                                    **DEFENDANTS**
**MIKE BEEBE, in his official capacity**
**as Governor of Arkansas**

<u>**SECOND MORE DEFINITE STATEMENT**</u>

 Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Second

More Definite Statement in response to the Defendant's Second Motion to Dismiss, treating their

Second Motion to Dismiss as a Second Motion for More Definite Statement.

1. The Defendants complain about the lack of facts supporting Plaintiff's allegation that the

criminal proceedings were retaliatory.

2. In this (hopefully last) More Definite Statement, Plaintiff will attempt to humor the

defendants, one last time, in an attempt to get this case moving.

 (a) By filing this More Definite Statement, Plaintiff is not conceding that the Defendant's

Second Motion to Dismiss has merit.  Plaintiff maintains that he has plead sufficient facts to

entitle him to judgment as a matter of law.  Plaintiff is filing, simultaneously with this More

Definite Statement, a Response in Opposition to the Defendant's Second Motion to Dismiss

which addresses the frivolousness of their motion in-depth.

3. While giving these facts, Plaintiff will assume that his injuries, as well as the controlling

law (including jurisdiction, venue, and sovereign immunity), have all been sufficiently plead.

After all, if the Defendants believed those pleadings to be insufficient, they would have placed

corresponding objections in one of their motions to dismiss. As a result, the contents of ¶¶ 1-7 as

well as ¶¶ 15-86 of the Original Complaint (Doc. 2) are hereby incorporated by reference.

4.      Once again, now that Plaintiff has indulged the Defense by clarifying the nature of his

claim, their Answer is now due in two weeks. See Fed.R.Civ.P. 12(a)(4)(B).

### FACTS OF THE CASE

5.      It is important to note that, until we get to ¶ 51 of this Amended Complaint, the facts

alleged will not implicate the State of Arkansas. However, these facts are nevertheless important

to establish the *existence* of a conspiracy *in the first place*. After all, what's the point of

implicating the prosecuting attorney in a conspiracy, if there is some dispute as to whether or not

a conspiracy even existed? Isn't that like suing someone for breach of contract when you can't

even demonstrate the existence of a contract in the first place?

(a)      However, do not think, for even one second, that the provisions of ¶¶ 7-50 are

essential, and that if Plaintiff cannot prove them, his entire claim should fail. With perhaps

the limited exception of ¶¶ 9-10, Plaintiff is pleading these facts because they show evidence

of conspiracy. However, Plaintiff does not need to prove, specifically, that there was a

conspiracy, to prevail on a claim of retaliation. One retaliator, acting by himself, is sufficient

to support a claim for retaliation, and since the State has no sovereign immunity whatsoever,

the State is equally liable for the actions of its sole officer, under the same "respondiat

superior" doctrine as private corporations are. See 42 USC § 12202. As long as Wes

Bradford committed the acts spoken of in ¶¶ 51-76, even if he acted as an independent,

Plaintiff is still entitled to recover for the tort of Retaliation. The facts spoken of in ¶¶ 7-50

certainly *help* to establish retaliation, but they are not *required*.

6.      That being said, the following facts are relevant to this case:

**Plaintiff's litigation history and governmental spite**

7.     Plaintiff has filed several lawsuits in the past.  However, most of Plaintiff's lawsuits were either for ADA discrimination or ADA retaliation.  Almost all of Plaintiff's lawsuits were filed under a good faith, reasonable belief that Plaintiff was entitled to redress for the specified wrongs.

8.     A list of Plaintiff's ADA discrimination lawsuits – as of November 2011 – including the name(s) of the Defendant(s), the case numbers, the court where the lawsuits were originally filed, and the reasons why Plaintiff believes they were filed in good faith (as is required under *Amir v. St. Louis University*), are all listed in the following seven sub-paragraphs:

(a)     Stebbins v. Reliable Heat & Air, LLC, Case No. 10-3305 in the U.S. District Court for the Western District of Missouri.  This lawsuit is in good faith because Plaintiff was doing the best he could at his job, but the employer – by his own admission – made absolutely no attempt to accommodate Plaintiff's Asperger Synrome. This resulted in a few misunderstandings between Plaintiff and the employer's customers that could easily have been avoided if the employer had provided reasonable accommodations.

(b)     Stebbins v. University of Arkansas, Case No. 10-5125 in the U.S. District Court for the Western District of Arkansas.  This lawsuit was filed in good faith because Plaintiff – who was an emotional wreck at the time out of fear of possibly hurting someone – made some statements which the University of Arkansas perceived as a threat. Plaintiff tried to explain that, because of his Aspergers, sometimes things can come out wrong, but the UA did not want to listen.

(c)     Stebbins v. Mid States Promotions, Case No. 10-3041 in the U.S. District Court for the Western District of Arkansas.  This lawsuit was filed in good faith because Owner Jason

Jones threw Plaintiff out of his wrestling school in retaliation for some allegedly

disrespectful remark Plaintiff's allegedly made about one of Jones' best wrestlers, and never

even *attempted* to provide the *extremely* reasonable accommodation of allowing Plaintiff to

apologize.

(d)     Stebbins v. Wal-Mart Stores Arkansas, LLC, Case No. 10-3086 in the U.S. District

Court for the Western District of Arkansas.  This lawsuit was filed in good faith because,

although Plaintiff was not applying for any position that required him to interact with

customers (having learned his lesson with Reliable Heat & Air), Wal-Mart's computerized

employment application test nevertheless asked Plaintiff questions regarding how to be

courteous with customers that involved position that Plaintiff was not even applying for.

This, in Plaintiff's opinion, had the disparate impact of discriminating against people with

Asperger Syndrome.

(e)     Stebbins v. Full Sail University, Case No. 10-3072 in the U.S. District Court for the

Western District of Arkansas.  This lawsuit was filed in good faith because Plaintiff's

attempts to communicate with the school's enrollment staff fell through the cracks because of

Plaintiff's Aspergers, and the school refused to provide any accommodation whatsoever for

Plaintiff's lack of social skills.

(f)     Stebbins v. Legal Aid of Arkansas, Case No. 11-3057 in the U.S. District Court for

the Western District of Arkansas.  This lawsuit was filed in good faith because they refused to

represent Plaintiff in "any matter" because Plaintiff had apparently said something they did

not like, and much like Jason Jones before them, they refused to take into consideration

Plaintiff's Asperger Syndrome by providing the VERY reasonable accommodation of

allowing Plaintiff to apologize for whatever it was that upset them.

(g)     Stebbins v. Harp & Associates, LLC, Case No. 11-3078 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because the Defendants evicted Plaintiff because of all the aforementioned lawsuits previously listed in this Exhibit. Plaintiff sued Harp & Associates in that case for much the same reason he is suing the State of Arkansas in this one.

9.      Wes Bradford - a prosecuting attorney for the State of Arkansas – knew of Plaintiff's litigation practices (since it was public record, and he was an attorney by trade, meaning he had access to these sorts of things) and disapproved of them. However, he knew that Plaintiff has the First Amendment right to file non-frivolous lawsuits, and knew that this right does not end simply because a government official (such as himself) disagrees with the lawsuits filed. As a result, he knew that he stood no chance of convicting Plaintiff in a jury trial of malicious prosecution under Ark. Code Ann. § 5-53-131.

10.     In light of the facts described in ¶ 9 of this Amended Complaint, Bradford was faced with a choice between persecuting Plaintiff for his lawsuits under the guise of a seemingly legitimate criminal charge, and simply respecting Plaintiff's right to court access. Bradford chose the former course of action.

**Apartment Eviction**

11.     Thus, in May of 2011, Plaintiff's landlord – Harp & Associates, LLC – evicted Plaintiff from his apartment. The *official* reason they gave for wanting to evict Plaintiff was because of some sort of "fire danger." However, Plaintiff had the testimony of two neighbors who could prove that the fire in question was not his fault. However, Harp & Associates clearly did not care about the evidence Plaintiff had that the fire was not his fault. Using sociology (also known as "behavorial science," or the science of how people react to certain things), this shows that Harp

& Associates was not truly concerned with the fire danger (because human beings do not react with apathy to things they actually care about; in fact, "apathy" and "caring" are literally antonyms), thus proving evidence of pretext.

12.    No, it is clear, at this point, that Harp & Associates wanted Plaintiff out of the apartment, not for safety reasons, but because the Boone County government told them to. It is clear that the Boone County government wanted Plaintiff far, far away from the neighbors who already demonstrated a willingness to testify in his defense if they knew he was innocent of a crime.

13.    Plaintiff put up a good resistance in the unlawful detainer action that Harp & Associates filed against him in order to evict him. However,

14.    So, Plaintiff had no choice but to move back in with his parents, since no other apartments that were remotely within Plaintiff's budget had any openings at the time.

### The Residence with Parents

15.    Plaintiff spent a total of two (2) months with his parents, trying to save up enough money to obtain another vehicle (as he had lost his previous vehicle in a crash that Plaintiff admits the State had no involvement in), and subsequently put down enough money for a security deposit for an apartment.

16.    His parents – in an attempt to remind Plaintiff that he was going to suffer under their roof – forced Plaintiff to sign a humiliating, embarrassing contract, admitting to things that he never did, forcing him to do labor (but not stating what that labor was), and requiring him to always respect them, no matter how much they were harassing him (let's call that provision "the Respect Clause," since it will be important in a little bit).

17.    However, there was ONE consolation that the father – in an act of what little humanity remained inside him – agreed to give Plaintiff: He would be entitled to "full Internet access

whenever [Plaintiff's] parents are not using it."

18.    This contradicted the terms of a previous version of this contract which stated that

Plaintiff would only be allowed Internet access "when [his] father says [he] can use it."  Plaintiff

took this parole evidence to mean that, with this new version that Plaintiff and the father ended

up actually singing, the father was bound to allow Internet access, and had no discretion to

revoke it whenever he felt like it (again, keep this in mind, as it will also be important later).

19.    The father took full advantage of the Respect Clause, and proceeded to repeatedly harass

Plaintiff whenever Plaintiff's mother was not around to see it.  He would repeatedly call Plaintiff

an idiot, throw him against the wall, yell directly in Plaintiff's ear, and a variety of other things.

20.    It was clear that the father was going out of his way to provoke Plaintiff into hitting him,

so he could have Plaintiff (because, as long as the mother was not around to witness it, Plaintiff

would be unable to *prove* the affirmative defense of provocation).  At one point (Plaintiff

believes it was in October), he even goaded Plaintiff, saying "What?  You wanna hit me?!  You

wanna hit me, you little punk?!"

21.    Of course, Plaintiff knew he could not do anything about it.  While the father was clearly

breaking the law, he was careful to leave no marks on Plaintiff's body.  Plaintiff knows that is a

nuance of Arkansas law that a police officer cannot arrest someone for battery unless they see it

happen themselves, or the victim has some sort of mark on their body.

22.    Plaintiff did everything in his power to keep his cool against his father, since he knew he

would bring suit against his father after he had secured living arrangements.

23.    However, on November 24, 2011, Plaintiff had what he considered to be an opening.  The

Internet connection was excessively slow on that night.  This meant that Plaintiff was not getting

"full" Internet access, as the contract entitled him.  Because Plaintiff was not getting the

consideration he had bargained for, it was his right to violate the terms and conditions that *he* was bound by.

24.     Thus, he proceeded to demand that the Internet speed be fixed, and his father retaliated by disconnecting the Internet router (which was an essential tool to enjoying the Internet connection) altogether.  In hindsight, Plaintiff now realizes that his father had most likely already arranged in advance for this issue to be ignored when arresting Plaintiff, but keep in mind: Plaintiff had just endured two whole months of harassment; he was not thinking clearly, and justifiably so.

25.     The father also decided that he were going to throw Plaintiff out onto the streets to starve once his wife returned home to say goodbye to Plaintiff.  He decided that he was not going to give Plaintiff the benefit of an unlawful detainer action, but instead would simply have Plaintiff arrested for criminal trespass.  Again, this was patently illegal (as Plaintiff had a contract allowing him to live there), but was most likely arranged in advance with the police.  Hindsight is 20/20.

26.     Plaintiff had the right to the Internet connection, so he entered his father's bedroom in an attempt to re-take the router.  After all, since the router was just as essential to the enjoyment of the Internet connection as the front door key is essential to the enjoyment of an apartment unit, the taking of the Internet router without legal justification was just as much a "theft" as stealing an apartment key (see *Lopez v. Vanderwater*, 620 F. 2d 1229, 1235 (7th Cir. 1980) ("[The Defendant] determined the offense to be charged, originally contemplating criminal trespass and then deciding on theft of the key")).  Thus, Plaintiff had the legal right to use nondeadly physical force to terminate the commission of this theft.  See Ark. Code Ann. § 5-2-609.  Furthermore, since that house was – at the time – supposed to be Plaintiff's residence, that means he was

*supposed to be* entitled to the benefit of presumption that his force used was justified (See Ark. Code Ann. § 5-2-620(a)), and the State would hold the burden of proof that the force used was NOT justified (see Ark. Code Ann. § 5-2-620(b)).

27.     So, Plaintiff entered his father's bedroom in an attempt to reclaim the router, and the father jumped out of bed and, in a fit of emotional rage, punched Plaintiff in the face – right above the eye - for having the unmitigated gal to stand up to him.

28.     Plaintiff does not believe that this was part of the plan to have Plaintiff arrested. Rather, Plaintiff believes that this was just a knee-jerk reaction that his father committed without any foresight.

29.     Plaintiff, having been knocked into a seated position on the floor, reached up and felt the spot where his father punched him. He felt a lump on his eye. There, there was the mark on his body that Plaintiff needed. Finally, Plaintiff had a chance at justice (of course he didn't; his father had arranged with the police to be above the law, but again, Plaintiff was not thinking clearly at the time).

30.     So, Plaintiff went to his computer to try and call the police using his "Skype" application, only to then realize … oh wait; *there's no Internet connection.* So, he went to retrieve the phone book for that house so he could look it up. This phone book was located in the dining room, which provided a clear view of the kitchen. In the kitchen, Plaintiff could see his father using a knife to gently and carefully cut himself over the forehead.

31.     In Plaintiff's emotionally wrecked state, he did not initially think anything of it. He thought to himself "If that bastard wants to cut himself like an emo, that's his business."

32.     However, once Plaintiff had the phone number, he went back to his computer (yes, again, because as we've established, he was losing his mind at the time), to actually *call* the police.

Except, oh wait, that's right; NO INTERNET, DUH!

33.    So, he exited his bedroom, and passed by his father's bedroom (where the door was still open), where he could see his father holding a pillow in his hands, and bobbing his head up and down, getting the blood all over the pillow while also causing the blood to spread across his face.

34.    It was at THAT point that Plaintiff realized that his father was *planting evidence* to frame him for a knife attack!

35.    So, Plaintiff panicked. He then ran to the landline phone and called the Boone County Sheriff's Department, explaining that his father hit him and then proceeded to cut himself with the knife so that he would not go to jail.

36.    Plaintiff did not take his eyes off his father again, in the hopes that, if his father tried to plant additional evidence, he could take a picture of it with his cell phone camera.

### The Arrest

37.    The police arrived shortly after Plaintiff called them. Specifically, Jason Beathke responded to the call, joined about a minute afterwards by a deputy by the name of David Upton. Both Plaintiff, and his father, were waiting on opposite sides of the front porch when the squad cars pulled up.

38.    Beathke took one look at Plaintiff, and demanded angrily that Plaintiff simply "get to the point." Plaintiff explained that his father punched him in the face, and then proceeded to cut himself. Beathke then asked Plaintiff to specify where his father cut himself; Plaintiff responded by pointing to his father, across from the porch, and said "Look at him, man?! Can't you see the lacerations with your own eyes?"

39.    Beathke then proceeded to walk over to the father, and asked "Hey, how you doing, tonight?" The father replied in a calm, clearly-not-scared-for-his-life tone of voice "Well, I've

seen better days."

40.     Beathke then asked the father what happened. The father explained that Plaintiff came storming into his bedroom with a knife in hand and started swinging it at his face in an attempt to steal the Internet router from him (it was his belief that, because he "owned" the router, it was his absolute right to exercise dominion over it. This was, of course, frivolous, since Plaintiff's contract rights overrode his ownership rights, but again, the father had arranged to be above the law). He also denied punching Plaintiff, despite Plaintiff clearly having evidence of being punched.

41.     Plaintiff attempted to advise Beathke that he had a contractual entitlement to the router, which overrode the father's ownership rights. Beathke did not react in any way to this news, almost as if he did not even hear it at all.

42.     Beathky, hearing the father's accusation, immediately walked over to Plaintiff's spot on the porch and demanded that Plaintiff face the wall. He then handcuffed Plaintiff, escorted him to the back of his squad car, and then entered the house in search of additional evidence to support the arrest.

43.     About twenty minutes passed by, and Beathke said that he found plenty of evidence to support that Plaintiff had attacked his father with the knife. He then closed Plaintiff's door and escorted Plaintiff to the Boone County Detention Center.

44.     About two weeks later, when Plaintiff finally got a copy of the arrest report, he noticed that there were several photographs of blood splattered on the wall and the floor... blood splatters that he did not remember ever seeing (remember, Plaintiff closely watched his father after he realized what the father was up to). This can only mean one thing: The father planted the extra blood there *in front of the cop*, and the cop nevertheless photographed it as evidence!

45.    The arrest report did speak of a knife that was found in the kitchen sink. The knife apparently contained trace amounts of blood on its blade. Alongside the knife was a green cloth which contained blood on it. In the arrest report, Bearthky reasoned that the cloth was used to wipe the blood off the knife in an attempt to cover the evidence.

46.    Both the knife and cloth were confiscated by Bearthky. However, Bearthky also found and photographed the pillow which the alleged victim claimed to have used as a shield.
Although photographed by an extremely blurry and low-quality camera, the pillow was never confiscated as evidence like the knife and cloth were.

47.    This lack of confiscation is a serious problem. A police officer is supposed to be trained to always confiscate evidence unless it physically cannot be confiscated (e.g. footprints in the mud, or blood splatters on a wall, cannot be confiscated. But, if it *can* be confiscated, it is a police officer's training to always confiscate it). Bearthky's failure to confiscate the pillow, therefore, can lead to only one conclusion: Bearthky made a conscious choice to abandon his training in light of what he considered to be exceptional circumstances. These "exceptional circumstances" which, in Bearthky's judgment, necessitated a divergence from his training were that... he needed an excuse to arrest "that guy who files lawsuits," and did not want to lose the opportunity he had before him by confiscating exculpatory evidence.

48.    It is also important to note that the description that Beathke gave to the knife meant that it did not meet the legal definition of a "deadly weapon" as defined by Arkansas law.

(a)    Specifically, the knife was bent out of shape, since it was too flimsy to penetrate human skin without becoming damaged itself.

(b)    This means that it does not meet the legal definition of a "deadly weapon," which is that the object "in its use, or manner of intended use, is readily capable of inflicting serious

physical injury." See § 5-1-102(4)(B).

(c)     An important key word in that definition is "readily." See, you can give someone a concussion with a pillow, if you swing it hard enough. However, no one would dare suggest that a pillow would be considered a "deadly weapon." You really have to go out of your way to make it capable of inflicting any real injury; thus, a pillow is not a deadly weapon, because it is not READILY capable of inflicting serious injury.

(d)     Likewise, this knife – which is described as being flimsy and dented out of shape – similarly fails to meet the definition of a "deadly weapon," since the knife – in its purported manner of use – was not "readily" capable of inflicting any more than flesh wounds.

49.     It is also worth noting that, not only was the weapon not "readily" capable of inflicting serious physical injury, but the victim himself did not suffer any. In fact, he returned to his job – at a scorching hot steel factory that required him to exert over 100lbs of force numerous times per day – the very next day after Plaintiff's arrest. This proves that the alleged victim suffered only minimal blood loss.

50.     Remember the points listed in ¶¶ 47-48; they will important in a little bit.

### The criminal proceedings

51.     It is at this point that we will now discuss the facts which implicate the State of Arkansas in the conspiracy. Please remember ¶ 4 of this More Definite Statement, and bear in mind the background that Plaintiff has established, while we analyze the significance of the upcoming facts.

(a)     Please also keep in mind the provisions of ¶ 5(a) of this More Definite Statement. The following paragraphs, up to ¶ 76, are all Plaintiff truly needs to support a claim for retaliation.

52.    Four days after his arrest, Plaintiff – who was still sitting in jail – was then charged by Wes Bradford with domestic battery in the 2nd degree, even though the clear lack of deadly weapons or serious physical injuries meant that the State had no probable cause to prosecute Plaintiff for anything beyond domestic battery in the 3rd degree.  The reason for the unwarranted increase in severity of charges was because Bradford did not want the case to go to misdemeanor court, where he would forfeit his ability to prosecute the action to the Boone County Misdemeanor Prosecutor Patricia Virnig, meaning he could not coerce Plaintiff into dismissing lawsuits.

53.    Plaintiff had no criminal record beyond minor traffic violations prior to the commencement of the criminal proceedings which form the basis of this lawsuit.  Bradford knew of Plaintiff's clean criminal record at the beginning of the criminal proceedings. Because of this lack of criminal record, Bradford knew that, if he were to wait for Plaintiff to do something he could prosecute, in order to coerce him into dismissing lawsuits, he would be waiting for a very long time.  In light of this, Bradford resigned to conspire with Bearthky and with Plaintiff's father (among others) to frame Plaintiff for a crime he could charge Plaintiff with.  The crime Plaintiff was ultimately framed for was 2nd degree domestic battery.

54.    While sitting in pre-trial incarceration, Plaintiff was repeatedly harassed, bullied, and even had his life threatened by Boone County Jailer Jason Jones, who owned the company Mid States Promotions, and loathes Plaintiff for the lawsuit he filed against that company (as mentioned in ¶8(c) of this More Definite Statement).  Please see Doc. 2, ¶¶ 54-61 for details about the injury this caused Plaintiff.  However, for *this* filing, Plaintiff wishes to add that Jason Jones had freely admitted to Plaintiff, straight-up, that Plaintiff was incarcerated because of his lawsuits.  Jones' exact words were "You've been allowed to abuse the legal system because

people felt sorry for you!  And now the system is gonna give you a big ass-raping!"

55.    After Plaintniff received a copy of the arrest report, he suggested to his lawyer at the time

– Lew Marczuk – that, if there was trace amounts of blood on the knife's blade, then there is a

good chance that there might be trace amounts of fingerprints on the knife's handle!  Perhaps a

quick taking of the fingerprints on the handle would have instantly exonerated Plaintiff.

56.    Despite this suggestion, Wes Bradford never even *attempted* to secure the fingerprints.

Sure, there was no guarantee that this would have worked, but there was no reason not to give it

the old college try, either.

57.    No, it is clear that Wes Bradford ignored this potentially exculpatory evidence – in direct

violation of *Kuehl v. Burtis*, 173 F. 3d 646, 650-651 (8th Cir. 1999) – not because he saw it as

pointless (because how can the possibility of fingerprint evidence EVER be pointless?), but

because he did not want to risk evidence coming back that would force him to let Plaintiff go,

and cost him his chance to persecute Plaintiff for his lawsuits.

58.    All throughout the criminal proceedings, Bradford repeatedly badgered Plaintiff in ways

that rightfully should have had him fined by the Court, and in ways that, in an employment

setting (rather than a courtroom setting) would undoubtedly give Plaintiff a cause of action for

"hostile work environment."

59.    Here are some examples of the most glaring instances of badgering that Bradford

subjected Plaintiff to:

(a)     At a hearing to reduce Plaintiff's bail bond, dated December 16, 2011, Plaintiff's

counselor at the time, Lew Marczuk argued to the Court that Plaintiff had no criminal record

beyond minor traffic violations.  Bradford agreed that Plaintiff had no prior felony, but

argued that the bail should stay at $75,000, because of Plaintiff's "prior history."  Since he

admitted that Plaintiff had no criminal record, that cannot possibly be the "history" he was talking about, so the only "history" that he possibly could have been talking about was...

Plaintiff's *litigation* history!

(b)    At a motions hearing dated February 24, 2012, Was Bradford told the state judge that Plaintiff was a vexatious and abusive lawsuit-filer. There really was no rhyme or reason for this statement. It was supposed to just be an ordinary motions hearing, and Wes Bradford just threw it out there, completely at random, that Plaintiff had filed a ton of lawsuits in the past. He flatly admitted that he was only mentioning this litigation history was "[j]ust to make the Court aware" (Page 3, Line 18 of the official transcript for that hearing).

(c)    At another motions hearing dated July 27, 2012, Wes Bradford pointed out that Plaintiff's own mother would be right to disown Plaintiff because of his crimes. So, what were these crimes? That Plaintiff attacked her husband with a flimsy non-lethal knife? HA! No, of course not! No, the crimes which, in Bradford's opinion, were so heinous that they would cause a mother to disown her son was... "Mr. Stebbins' propensity to file lawsuits against anybody he doesn't like." It was at this point that Bradford actually *cringed*, like a wizard who had just heard the name "Voldemort," showing that, in Bradford's mind, this crime was so heinous that it was painful for him to even *SAY* it! Meanwhile, a knife attack does NOT warrant a mother disowning her son, or a person cringing just at the thought of it.

(d)    On a motions hearing dated November 30, 2012, Wes Bradford repeatedly cut off Plaintiff and would not let him get a word in edge-wise. Plaintiff already discussed this hearing in ¶ 78 of his Original Complaint (Doc. 2), which he hereby incorporates by reference.

60.    On September 14, 2012, Bradford played what was *supposed* to be his trump card. He

submitted a plea offer to Plaintiff – a plea offer Plaintiff never even asked for – offering to reduce the charges to Domestic Battery in the 3rd Degree (which is what it should have been in the first place) if Plaintiff would agree to plead guilty and accept a year of probation.

61.     This seems harmless enough.  However, this was no standard plea agreement.  There were a total of seven (7) terms and conditions of probation listed in this plea offer.  Most of them were fine; they were standard probation terms, such as … no alcohol on probation … no further contact with the victim … and so on.

62.     However, Conditions #4 and #5 are the conditions which incriminate the Defendants in this case.  Those conditions were thus:  "4) the defendant [Plaintiff in this case] must dismiss any/all pending Pro Se lawsuits, 5) the defendant must not file any Pro Se lawsuits while on probation."

63.     Again, Plaintiff never asked for this plea offer to be submitted to him.  However, Bradford submitted it anyway, since the whole criminal proceeding was meaningless if he could not use it to coerce Plaintiff into ending his lawsuits.

64.     Rabekah Kennedy of the Public Defender's Office was representing Plaintiff at the time the plea offer mentioned above was submitted.  Kennedy attempted to negotiate the aforementioned plea offer with Bradford.  However, while Bradford was willing to lower the conditions of the plea agreement that pertained to Plaintiff's domestic battery charge, he was NOT willing to revoke, or even modify in any way, his demand that Plaintiff end his lawsuit practices.  Those terms were 100% non-negotiable.

65.     His refusal to negotiate the terms that were completely unrelated to the charges that he was *supposed* to be prosecuting, while remaining dogged on the demands that Plaintiff cease and desist his lawsuits, is evidence of pretext.  Again using sociology, it proves that Bradford

considered the domestic battery to be less important than the lawsuits. This is because it is a matter of sociology that "willingness to compromise" and "priority of agendas" are inversely proportionate. What that means in layman's terms is, the less important something is to you, the more willing you are to compromise that thing in order to get something MORE important.

Thus, his willingness to compromise the domestic battery, but not the lawsuits, shows that he considers the lawsuits to be more important than the domestic battery.

66.     When Kennedy explained to Bradford that his demands were illegal (citing the precedent of *United States v. Goodwin*, 457 US 368, 372 (1982) ("To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'"), Bradford retaliated by angrily revoking the plea agreement altogether. This counts as additional evidence of pretext: If Bradford could not have what he truly desired, he was at least going to make good on his threat to send Plaintiff to prison.

67.     Kennedy agreed that, at this point, a Motion to Dismiss the criminal proceedings under presumption of prosecutorial vindictiveness was warranted.

68.     However, this motion never came. Plaintiff repeatedly asked Kennedy if she had even *started* filing the motion, and she would always reply in the negative. She never offered any excuse for her failure to file it, only that she was "busy." Apparently, she was "busy" scratching her crotch.

69.     Thus, on November 28, 2012, after a solid two and a half months of waiting impatiently for her to file the motion on his behalf, Plaintiff filed a *pro se* Motion for Reappointment of Counsel, arguing, among other things, that Kennedy was refusing to submit a motion to dismiss for prosecutorial vindictiveness, despite there being clear grounds for doing so, and that Plaintiff wanted an attorney who would actually defend him vigorously and aggressively.

70.    This motion was filed at approximately 2:45PM on November 28, 2012 (the Clerks

Office should have a timestamp giving the exact time it was filed).  Then, at 5:04PM on that

same day, Plaintiff received an email from Kennedy, stating the following:

> "David, I spoke to Wes Bradford today and have new information on the case
> that I do think we need to meet about.  They are willing to drop the condition
> regarding lawsuits except for lawsuits dirrectly related to this case, of which I
> believe there are three counting the issue with Campbell.  I have to go to the jail
> in the morning, but can you come in tomorrow afternoon?"

71.    These facts do not seem to prove anything, not at first glance.  However, ¶¶ 66-70, taken

collectively, prove a great deal:

(a)    For starters, Plaintiff's *pro se* motion was not a motion to dismiss the proceedings; it

was a motion for re-appointment of counsel.  As far as the illegality of Wes Bradford's plea

demands were concerned, Plaintiff raised no new arguments or legal theories that would have

convinced Bradford that the actions were illegal.  Instead, the only thing Plaintiff did

differently was that he actually brought the issue to the attention of a tribunal. This means

that he did not need to be convinced that his actions were illegal; he already knew they were

illegal. This means that he did not commit these actions because he thought they were

legitimate or that he had the right to do them.  He committed these acts because he did not

think Plaintiff could do anything about it.  Because... you know... he has sovereign immunity,

and all that!

(b)    Also, notice that this message from Kennedy stated that Plaintiff was only required to

dismiss lawsuits related to the case.  However, this message did not state, with any degree of

specificity, the specific cases Plaintiff was expected to dismiss.  This effectively means that

this change was meaningless, as there was nothing (except maybe disbarment, but as Plaintiff

already established in ¶¶ 73-83 of his Original Complaint – incorporated by reference by ¶ 3

of this More Definite Statement – that policy does not offer even the slightest deterrence, due to the State's complete failure to ever use it) stopping Bradford from simply finding some random lawsuit he dislikes, and then saying "Umm, no, that's related to this case. And guess what? I don't have to prove that it IS related; you have to prove that it ISN'T! Because you're on probation, and that's how probation works! MWAH HA HA HA HA HA!"

(c)    Furthermore, notice what the email is NOT saying! It says that Bradford is agreeing to partially withdraw Probation Condition No. 4 ("the defendant must dismiss any/all pending Pro Se lawsuits") but it does NOT give any indication that he was willing to withdraw Probation Condition No. 5 ("the defendant shall not file any Pro Se lawsuits while on probation"). Thus, even if we disregard the possibility listed in sub-paragraph (b), Bradford is still making an unconstitutional demand for Plaintiff to restrict his court access.

(d)    Last but not least, this next piece of information is perhaps the most incriminating piece of information of them all, and it is the main reason why Plaintiff chose to copy Kennedy's exact message, word-for-word:

    i.    Notice the second sentence in Kennedy's message.

    ii.    She does not say "***He is*** willing to drop the condition regarding lawsuits;" she said "***They are*** willing to drop the condition regarding lawsuits."

    iii.    That's right: Wes Bradford *wasn't the only one*! There were MULTIPLE PEOPLE who were persecuting Plaintiff!

72.    Judging from all of the inferences spoken of in ¶ 71, we can draw only one conclusion: The modification spoken of in Kennedy's email was not done because Bradford had a genuine change of heart; instead, it was done solely because he knew that Plaintiff's criminal charges would be thrown out, and he needed to keep that case alive because, even though he was not

going to coerce Plaintiff to dismiss the lawsuits, he at least needed to keep the case alive in order

to make good on his threat to send Plaintiff to prison. THAT is why he gave the concession

spoken of in ¶ 71.

73.    A hearing on the *pro se* Motion for Reappointment of Counsel before presiding Circuit

Judge Gordon Webb on November 30, 2012. In this hearing, the following events occurred in

the following chronological order:

(a)    Bradford pointed out to Webb that Plaintiff, by his own admission, had filed a similar

motion five previous times.

(b)    Plaintiff attempted to explain himself by saying "I understand how you can see a

pattern from that. However-"

(c)    Bradford, in a direct and malicious attempt to prevent Plaintiff from being able to tell

his side of the story, interrupted Plaintiff and declared "You're Honor, I think I'm noticing a

pattern because there IS one!"

(d)    Webb, knowing full well that this interruption constituted badgering, reminded

Bradford that this "pattern" may not necessarily be entirely Plaintiff's fault.

(e)    Bradford was never sanctioned for the badgering. He was not sanctioned because he

is a prosecuting attorney, and prosecuting attorneys are never sanctioned.

(f)    Plaintiff proceeded to advise Webb that there was evidence to suggest that the entire

case before it – from the arrest to the present – was designed for the exclusive purpose of

persecuting Plaintiff for his lawsuits.

(g)    Webb immediately asked if Plaintiff had any evidence to support the accusation.

i.    Notice what Plaintiff just said, there. Despite Webb being present for the clear

acts of badgering spoken of in ¶ 71 of this Amended Complaint, he actually disavowed

any knowledge of any evidence that Bradford had any vindictive motive.

    ii.     Also, the fact that Webb "immediately" asked for this proof – rather than doing

what a normal person would do, and asking for details concerning the accusation (proof

would come later) – shows that Webb did not need the details; he had already been fully

briefed on the issue. Despite this fore-knowledge, Webb clearly was not willing to toss

the case out to protect Plaintiff's due process rights. Clearly, it's because he just did not

care.

(h)    Plaintiff, in response to the request for proof, explained that Bradford's plea demand –

which Plaintiff never even asked for in the first place – demanded that Plaintiff dismiss all of

his lawsuits.

(i)    Immediately after Plaintiff made the accusation spoken of in ¶ 73(h), Bradford freely

admitted to the accusation, arguing that, because he is not "required" to submit any plea

agreements, he should be allowed to commit whatever ethical violations he pleases when

doing so.

(j)    Despite, as set forth in ¶ 71, the demand for dimissal of lawsuits being merely

modified, Bradford then proceeded to lie to Webb and told him that the demand had been

completely revoked altogether. Bradford then argued that, because the demand had been

revoked, the fact that he made the demand in the first place could not be used as evidence of

any malevolent intentions.

(k)    Kennedy proceeded to agree with Bradford, explaining that this revokation of the

lawsuit demand (which never happened) was the reason she did not file the Motion to

Dismiss. In making this argument, she deliberately and maliciously left Webb with the

misconception that the revokation happened before the Motion for Reappointment of

Counsel was filed, rather than afterwards.

    i.     Such blatant lying suggests that Kennedy may have been blackmailed into siding with the State.

(l)     Plaintiff attempted to advise Webb that the allegations spoken of in Requested ¶ 73(j) were patently false.

(m)    Despite having no evidence except the word of the parties involved, Webb proceeded to trust the word of the prosecutor (because he always trusts the prosecutor, no matter what) and agree that the fact that this demand was made in the first place was inadmissible to prove that Bradford was ever acting with any unethical intentions.

74.     On February 3, 2013, Bradford only then agreed to withdraw the demand that Plaintiff dismiss his lawsuits, rather than merely modify it.  The withdrawal was motivated, at least in part, by the Report & Recommendations entered by Magistrate Judge James R. Marchewski who recommended the prospective restriction of Plaintiff's litigation practices.

75.     A plea agreement which, among other things, called for the dismissal of charges without conviction (which satisfies the precedent of *Heck v. Humphrey*, 512 US 477 (1994)), was entered into in Plaintiff's criminal case on February 8, 2013.

76.     Yes, once the issue of lawsuits was taken care of, the criminal proceedings were terminated in literally LESS THAN A SINGLE WEEK!  This, along with the provisions of ¶¶ 64-65 of this More Definite Statement, provides evidence of pretext.  Taking sociology into account, Bradford's actions were consistent with those of a man who had finally gotten what he wanted, and was simply tying up the loose ends, not a man who had seen the error of his ways and wanted to repent his evil ways.

## CONCLUSION

77.     These facts – from ¶¶ 7-76 – taken as a whole, would compel ANY jury of sound mind to realize that there was a clear pattern, conspiracy, and desire to persecute Plaintiff. According to the aforementioned Law of Compound Probabilities (See Doc. 12, ¶¶ 63-73), the odds of this all being coincidence is one in a million.

78.     It is important to understand that "the elements of a conspiracy are rarely established through means other than circumstantial evidence." See *White v. McKinley*, 519 F. 3d 806, 816 (8th Cir. 2008). Here, however, Plaintiff has much more than mere circumstantial evidence. Due to a mistaken belief that he would have sovereign immunity, Wes Bradford has made no attempts whatsoever to hide his vendetta. He has freely admitted to holding this vendetta against Plaintiff, and has engaged in acts that would instantly cause any person *without* immunity to be instantly liable (no litigation necessary; this would be resolved in summary judgment) for the tort of "hostile work environment." He openly refused to correct his behavior (eliminating any possibility that it was just an honest mistake or slip of the tongue) until Plaintiff had grown a spine and filed a Motion with the state court to stand up to him, and even then, he did not really "correct" his behavior in any meaningful way.

79.     WHEREFORE, premises considered, Plaintiff respectfully requests that the relief requested in ¶¶ 48-83 of the Original Complaint (Doc. 2) be awarded to Plaintiff, costs incurred be awarded, and any other relief to which he may be entitled.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com